RECORD NO. 12-7119

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals
## For The District of Columbia Circuit

# STEPHEN P. AMOS,

*Plaintiff – Appellant*,

**v.**

# DISTRICT OF COLUMBIA; EMEKA C. MONEME, Director, District Department of Transportation; IRVIN B. NATHAN, Attorney General, District of Columbia,

*Defendant – Appellees*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————

### BRIEF OF APPELLANT

———————

Adam Augustine Carter
R. Scott Oswald
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, N.W., 9th Floor
Washington, D.C.  20006
(202) 261-2803

*Counsel for Appellant*

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

|                                   |   |                      |
|-----------------------------------|---|----------------------|
| **STEPHEN P. AMOS,**              | ) |                      |
|                                   | ) |                      |
| **Appellant,**                    | ) |                      |
|                                   | ) | **Case No. 12-7119** |
| **v.**                            | ) |                      |
|                                   | ) |                      |
| **THE DISTRICT OF COLUMBIA,**     | ) |                      |
|                                   | ) |                      |
| **Appellee.**                     | ) |                      |

_____

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to the Court's November 13, 2012 Order, Appellant, Stephen P. Amos,

("Amos") files the following Certificate as to Parties, Rulings, and Related Cases:

**I.      Parties**

Amos is the Appellant.  The District of Columbia is the Appellee.  There are no

intervenors or *amici curiae* at this time.

**II.      Rulings**

In Case No. 12-7119 Amos appeals the District Court's May 9, 2012 and October 19,

2012 denial of Amos's motion for judgment notwithstanding the verdict, and in the alternative, a

new trial and Amos's renewed motion for judgment notwithstanding the verdict, or in the

alternative, a new trial.

**III.      Related Cases**

This case originated in the U.S. District Court for the District of Columbia.  Amos'

appeal from the District Court's denial of judgment notwithstanding the verdict has been

docketed as no. 12-7119.  Counsel for Amos is unaware of any other related cases.

1

Respectfully submitted,

<u>         /s/                              </u>
Adam Augustine Carter, D.C. Bar 437381
R. Scott Oswald, D.C. Bar 458859
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
acarter@employmentlawgroup.com
*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of December, 2012, the foregoing Certificate of Parties, Rulings and Related Cases was served upon the following via ECF:

Thomas Koger, Esq.
Bradford Patrick, Esq.
Office of the Attorney General for the District of Columbia
441 4th Street NW, 6th Floor South
Washington, D.C. 20001
(202) 727-4170
(202) 727-6295 (facsimile)
thomas.koger@dc.gov
*Counsel for Defendant*

_____/s/_____
Adam Augustine Carter

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................iv

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUES..............................................................................2

STATUTES AND REGULATIONS .........................................................................3

STATEMENT OF THE CASE..................................................................................4

STATEMENT OF THE FACTS ...............................................................................7

SUMMARY OF THE ARGUMENT .....................................................................11

ARGUMENT .........................................................................................................15

     I.     The District Court's Response to the Jury's Note Was Incorrect, Misleading, and Not Harmless Error ....................................................15

          A.     Standard of Review ..............................................................15

          B.     The District Court's Response to the Jury's Note Did Not Take Account of the Important Common Law and Statutory Exceptions to Employment At-will...........................16

          C.     The Error Was Not Harmless Because It Concerned the Jury's One and Only Note to the District Court, and It Allowed the Jury to Confuse the Concept of Employment At-will, and the Exception to it That the DC-WPA Represents .........................................................................19

     II.     The Jury Instruction on Amos Proving a "Direct Causal Link" Between His Protected Disclosure and His Supervisor's Prohibited Personnel Action Was Incorrect and Misleading.............22

          A.     Standard of Review ..............................................................22

i

B.    The District Court Erred When Instructing the Jury on the Burden of Proof Under the DC-WPA ................................22

C.    This Error Was Not Harmless Since It Was on Liability and Concerned the Burden of Proof ...........................................26

III.   A Review of the Record in This Case Shows How Confused the Jury Was By the District Court's Errors of Law.................................28

A.    Appellate Review Is Appropriate Not to Displace Jury Decision But to Evaluate Whether Error Was Not Harmless......................................................................................28

B.    Amos Made Numerous Protected Disclosures .........................28

1.    Amos's Credibility Is Immaterial ...................................30

2.    December 4th Memo Is Protected Disclosure and So Is the Act of Passing it on to Supervisors ................33

3.    Supervisors Admitted Amos Disclosed the December 4th Memo and Discussed it With Moneme .........................................................................35

4.    Amos Had an Objectively Reasonable Good Faith Belief the December 4th Memo Was a Protected Disclosure ......................................................40

C.    The District Did Not Prove a Legitimate, Independent Reason to Terminate Amos......................................................43

IV.   It Was an Abuse of Discretion to Require a Complex Verdict Form ........................................................................................45

A.    Standard of Review.................................................................45

B.    Special Interrogatories Indicating a Complex Burden Shifting Analysis Were Improper and a General Liability Verdict Form Was Needed......................................................45

ii

CONCLUSION ....................................................................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## Federal Cases

*Cabrera v. Jakabovitz*,
  24 F.3d 372 (2d Cir. 1994) ...........................................................................47

*Caudle v. Dist. of Columbia*,
  804 F. Supp. 2d 32 (D.D.C. 2011),
  *rev'd and remanded*,
  707 F.3d 354 (D.C. Cir. 2013)......................................................................45

*Coburn v. Pan American World Airways*, *Inc.*,
  711 F.2d 339 (D.C. Cir. 1983)......................................................................30

*Cook v. IPC Int'l Corp.*,
  673 F.3d 625 (7th Cir. 2012)...........................................................21, 27, 48

*Cupp v. Naughten*,
  414 U.S. 141 (1973)......................................................................................26

*Czekalski v. LaHood*,
  589 F.3d 449 (D.C. Cir. 2009)..................................................15, 16, 20, 21

*Davis v. Dist. of Columbia*,
  503 F. Supp. 2d 104 (D.D.C. 2007)..............................................................23

*Gordon v. New York City Bd. of Educ.*,
  232 F.3d 111 (2d Cir. 2000) ..............................................16, 27, 46, 47, 48

*Griffin v. Washington Convention Ctr.*,
  142 F.3d 1308 (D.C. Cir. 1998)....................................................................15

*Hathaway v. Coughlin*,
  99 F.3d 550 (2d Cir. 1996) ...........................................................................27

*Chief Authorities are Designated with An Asterisk*

*Hayman v. National Academy of Sciences*,
    23 F.3d 535 (D.C. Cir. 1994)..........................................................................30

*Hendricks v. Coughlin*,
    942 F.2d 109 (2d Cir. 1991) ......................................................................27

*Jordan v. Medley*,
    711 F.2d 211 (D.C. Cir. 1983)....................................................................15

*Joy v. Bell Helicopter Textron, Inc.*,
    999 F.2d 549 (D.C. Cir. 1993)................................................... 15-16, 20, 21

*Kotteakos v. United States*,
    328 U.S. 750 (1946)....................................................................................15

*Lachance v. White*,
    174 F.3d 1378 (Fed. Cir. 1999) ..................................................................41

*Liser v. Smith*,
    254 F. Supp. 2d 89 (D.D.C. 2003)..............................................................41

*LNC Investments, Inc. v. First Fidelity Bank, N.A.*,
    173 F.3d 454 (2d Cir. 1999) .................................................................16, 27

*Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*,
    493 F.3d 160 (D.C. Cir. 2007)....................................................................16

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)............................................................................. 23-24

*Renz v. Grey Advertising, Inc.*,
    135 F.3d 217 (2d Circ. 1997) .....................................................................47

*United States v. Baker*,
    693 F.2d 183 (D.C. Cir. 1982)....................................................................26

*United States v. Lemire*,
    720 F.2d 1327 (D.C. Cir. 1983)..................................................................26

*United States v. Olano*,
    507 U.S. 725 (1993)..................................................................................16

*United States v. O'Looney*,
    544 F.2d 385 (9th Cir. 1976) ...........................................................45

*United States v. Reed*,
    147 F.3d 1178 (9th Cir. 1998) .........................................................45

*Uphoff Figueroa v. Alejandro*,
    597 F.3d 423 (1st Cir. 2010) ...........................................................45

*Western Air Lines v. Criswell*,
    472 U.S. 400 (1985)..........................................................................26, 28

**State Cases**

*Adams v. George W. Cochran & Co., Inc.*,
    597 A.2d 28 (D.C. 1991) ...........................................................17, 18, 19

*Beckman v. Farmer*,
    579 A.2d 618 (D.C. 1990) ...........................................................15

*Carl v. Children's Hosp.*,
    704 A.2d 159 (D.C. 1997) (en banc) ......................................18, 20

*Crawford v. Dist. of Columbia*,
    891 A.2d 216 (D.C. 2006) ...........................................................23, 25, 26

*Darrow v. Dillingham & Murphy, LLP*,
    902 A.2d 135 (D.C. 2006) ...........................................................19

*Zirkle v. Dist. of Columbia*,
    830 A.2d 1250 (D.C. 2003) .........................................................41

**Federal Statutes**

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1332(a) ................................................................................1

## State Statutes

\*District of Columbia Whistleblower Protection Act ......... 2, 4, 5, 6, 11, 12, 13, 16, 17, 18, 19, 21, 22, 23, 27, 28, 29, 32, 33, 34, 35, 36, 37, 38, 43, 44, 46, 48

D.C. Code § 1-615.52 .................................................................4, 23, 29, 35

D.C. Code § 1-615.52(a)(6) ...........................................................33, 34, 43

D.C. Code § 1-615.52(a)(7)(A)...............................................................35

D.C. Code § 1-615.52(a)(8) .....................................................................34

D.C. Code § 1-615.52(a)(9) .....................................................................34

D.C. Code § 1-615.53 .........................................................4, 23, 25, 29

D.C. Code § 1-615.53(a)....................................................................17, 18

D.C. Code § 1-615.54 .............................................................................4, 23

D.C. Code § 1-615.54(b)....................................................................25, 43

D.C. Code § 1-617.01 ......................................................................34, 35

## Federal Rules

Fed. R. Civ. P. 50(a)...................................................................................4

Fed. R. Civ. P. 50(b) ..................................................................................5

Fed. R. Civ. P. 59(a)...................................................................................5

Fed. R. Civ. P. 61 ....................................................................................16

# STATEMENT OF JURISDICTION

The United States District Court for the District of Columbia ("District Court") had subject matter jurisdiction over this civil action since the matter in controversy exceeds the sum of $75,000, and is between citizens of different States, pursuant to 28 U.S.C. § 1332(a).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to hear this appeal from the District Court's entry of judgment on the verdict dated November 21, 2011, its decision denying Plaintiff's initial post-trial motion on May 9, 2012, and its final decision filed October 19, 2012, denying Plaintiff's Renewed Motion for Judgment Notwithstanding the Verdict, or in the alternative for a New Trial.

On November 8, 2012, a notice of appeal was timely filed with the District Court.

This appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES

I.    Whether the District Court erred in giving an incomplete and misleading statement of the law in response to a note from the jury regarding employment at-will in a case involving a whistleblower, when important common law and statutory exceptions to the employment at-will doctrine such as the District of Columbia Whistleblower Protection Act were involved in this case?

II.   Whether the District Court erred in giving a faulty jury instruction on the causation standards applicable to the District of Columbia Whistleblower Protection Act?

III.  Whether the District Court abused its discretion in requiring the jury to complete a complicated verdict form with confusing special interrogatories rather than a simple or general verdict form for a single count of retaliation under the District of Columbia Whistleblower Protection Act?

2

## **STATUTES AND REGULATIONS**

All pertinent statutes and regulations are set forth in the Addendum bound together with this brief.

## STATEMENT OF THE CASE

At the close of the evidence, Plaintiff Stephen P. Amos ("Plaintiff" or

"Amos"), and Defendant District of Columbia ("Defendant" or the "District"),

moved orally under Fed. R. Civ. P. 50(a) for judgment as a matter of law.  Amos

based his motion on the fact that the testimony uncontrovertibly demonstrated:

(a) that Amos made no fewer than seven (7) protected disclosures; (b) that Amos

suffered a prohibited personnel action; and (c) that the protected disclosures were a

contributing factor to the prohibited personnel action.  *See* D.C. Code §§ 1-615.52-

54 (2001); *see also* J.A. at 912-27.  Moreover, Amos argued even if the District

could proffer evidence of a legitimate, independent reason for his termination by

clear and convincing evidence, Amos's evidence showed a direct causal link

between the prohibited personnel action and the termination.  For its motion, the

District argued that Amos failed to make out a *prima facie* case of retaliation under

the District of Columbia Whistleblower Protection Act ("DC-WPA").  After

hearing arguments from both sides, the Court denied both motions.

The District Court gave a faulty jury instruction saying that Amos had to

prove "a direct causal link" between his protected disclosures and his supervisor's

prohibited personnel action in order to make out a claim under the DC-WPA.

Amos objected to this instruction (and so did the District), but the District Court

gave the instruction over the parties' objection.

The District Court also required the jury to fill out a complex verdict form complete with special interrogatories on a single count of retaliation under the DC-WPA.  Amos objected to the verdict form prior to the jury retiring for its deliberations.

During its deliberations, the jury sent out a single note with the following request:  "Could you please provide the description for the Whistleblower Act and At will employee."  The District Court gave the following written response:

> Employment at will is employment that is usually undertaken without a contract and that may be terminated at any time, by either the employer or the employee, without cause.

> The D.C. Whistleblower Protection Act forbids a supervisor from retaliating or threatening to retaliate against an employee of the D.C. government because of the employee's protected disclosure.

At the conclusion of the trial, the jury determined that Amos had not made a protected disclosure during his tenure as the Chief of Staff for the District of Columbia Department of Transportation ("DDOT") and, returned a verdict in favor of the District.

On December 6, 2011, Amos filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, in the alternative, for a new trial under Rule 59(a).  Amos put forth the following arguments in his motion:  (1) that, based on the evidence, no reasonable jury could conclude that Amos did not make

a protected disclosure; (2) the District Court did not give the jury the proper instruction on the causation standard required under the DC-WPA during the various burden shifts; (3) the District Court did not properly instruct the jury on the DC-WPA or give a complete description of "at-will" employee in response to the note from the jury during the course of the jury's deliberations; and (4) the District failed to meet its burden of proving by clear and convincing evidence that it terminated Amos for legitimate and independent reasons.

Then, on May 9, 2012, the District Court issued an order denying, with prejudice, Amos's motion seeking a judgment that his protected disclosures were a contributing factor to his termination and that the District failed to prove, by clear and convincing evidence, that Amos was terminated for legitimate reasons independent of his protected disclosures. The District Court, however, requested further briefing in a renewed motion, as to whether a reasonable jury could conclude that Amos did not make protected disclosures. The Court later denied Amos's renewed motion on October 19, 2012, and this appeal followed.

## STATEMENT OF THE FACTS

Amos was a hired by the District in July of 2007 as Chief of Staff to Emeka Moneme ("Moneme"), Director of DDOT.  *See* J.A. at 614, 439.  As Chief of Staff Amos "provide[d] assistance to and actively participate[d] with the DDOT Director in decision-making processes for successful accomplishment of the DDOT mission."  *See id*. at 1185.

As Chief of Staff, Amos supervised Equal Employment Opportunity Specialist, Francisco Gonzalez ("Gonzalez").  Gonzalez's duties included ensuring contract work performed for the District was compliant with civil rights programs and regulations.  *See id.* at 191.  During a routine meeting on December 3, 2007, Gonzalez outlined his concerns about Fort Myer and Pessoa at South Capitol Street for Amos.  *See id.* at 205-06.  In addition to Fort Myer's noncompliance at South Capitol Street, Gonzalez told Amos about similar misconduct Gonzalez had uncovered at the Foxhall Road site.  *See id.* at 206-07.  Gonzalez informed Amos that Peake Construction Company, another DBE subcontractor, was having another company perform their work for them.  *See id.* at 207.  Amos requested Gonzalez put all of this evidence and analysis into writing and to provide Amos with a memo.  *See id.* at 210.  On December 4, 2007, Gonzalez provided Amos with a memo describing in detail the issues Amos and Gonzalez had discussed the day before.  *See id.*; *see also id*. at 1172-75 ("December 4th Memo").

7

The morning of December 5, 2007, at a meeting, Amos disclosed to Carol Kissal ("Kissal"), DDOT's Deputy Director of Resource Management at the time, and to Ken Laden ("Laden"), DDOT's Associate Director Transportation Policy and Planning Administration at the time, all the allegations in the December 4th Memo by handing them a copy of it. *See id.* at 643-44. Additionally, Amos stated that because of the criminal nature of the allegations any investigation would be outside of DDOT's parameters and the December 4th Memo would have to be forwarded to the Office of Inspector General ("OIG") for investigation. *See id.* at 645. Shortly thereafter Amos sent a copy of the December 4th Memo to the OIG. *See id.* at 711. After the meeting on December 5, 2007, both Kissal and Laden separately approached Amos and asked Amos to keep the information internal and not forward it to the OIG. *See id.* at 645-46.

Additionally, on December 5, 2007, Amos brought his concerns regarding the allegations in the December 4th Memo to the attention of his supervisor, Moneme. *See id.* at 447-48. The two men discussed concerns the December 4th Memo outlined about Fort Myer, Pessoa, and Peake. *See id.* at 447-48. Moneme believed the allegations Amos was bringing to Moneme's attention were serious. *See id.* at 448. Moneme believed Amos had acted properly in bringing the allegations in the December 4th Memo to Moneme's attention. *See id.* Despite his

belief that the allegations were serious, Moneme asked Amos to delay sending the December 4th Memo to the OIG. *See id.* at 448-49.

On December 6, 2007, Amos approached Neil Richardson, deputy chief of staff for the Executive Office of the Mayor under Mayor Adrian Fenty, to discuss the concerns Amos had about evidence of questionable contracting between the District government, Fort Myer Construction, and Peake. *See id.* at 553. In response, Richardson told Amos that Richardson may not be the most appropriate member of the Administration to talk to and referred Amos to the Mayor's General Counsel Peter Nickles. *See id.* at 554. Taking Richardson's advice, Amos discussed his concerns about the allegations raised by the December 4th Memo with Nickles, who advised Amos to go to the OIG. *See id.* at 87.

On December 7, 2007, Amos, along with Danette Walker-Mincey, Chief of the Office of Integrity and Workforce Compliance, went to the OIG to discuss the concerns about Fort Myer, Pessoa, and Peake. *See id.* at 418. At the meeting with the OIG, Amos informed the OIG he had evidence of officials in the D.C. Government conspiring with Fort Myer. *See id.* at 336, 421, 656-59. Roger Burke, Chief of Staff of the OIG at the time, sent an e-mail to Nickles, on December 13, 2007 stating Amos did meet with OIG representatives in December 2007 and "raised *serious allegations* concerning certain entities and individuals." *Id*. at 1189 (emphasis added).

9

Upon learning Amos disclosed the allegations in the December 4th Memo to the OIG against Moneme's directions, Moneme became very angry with Amos and accused Amos of "betray[ing]" him.  *See id.* at 665.  Following Moneme's outburst about Amos's "betrayal" Moneme began retaliating against Amos by decreasing his job responsibilities and ultimately terminating Amos on January 11, 2008.  *See id.* at 685.  Throughout Amos's tenure at DDOT Amos never received any communication prior to his termination that he was not performing satisfactorily. *See id.* at 460.

# SUMMARY OF THE ARGUMENT

In a case for retaliatory discharge brought under the District of Columbia

Whistleblower Protection Act ("DC-WPA"), it was reversible error for the District

Court to give an incomplete and inaccurate statement of the law in response to a

note from the jury asking: "Could you please provide the description for the

Whistleblower Act and At will employee." The District Court's written response

was given, over objection from Amos, as follows:

> Employment at will is employment that is usually
> undertaken without a contract and that may be terminated
> at any time, by either the employer or the employee,
> without cause.
>
> The D.C. Whistleblower Protection Act forbids a
> supervisor from retaliating or threatening to retaliate
> against an employee of the D.C. government because of
> the employee's protected disclosure.

It was error for the District Court to give such an inaccurate and simplistic

response, and error not to instruct that there are important exceptions to the at-will

employment doctrine – ones that are especially relevant in this case. Plainly, an

employer may not terminate an employee for an illegal reason, or for failure to

follow an illegal order, and termination in retaliation under the DC-WPA stands as

an obvious exception to employment at-will. Since this was the one and only note

from the jury, and since the District Court did not refer to or incorporate by

reference any of its other instructions describing the DC-WPA, it cannot be said that this error by the District Court was harmless. A new trial is required.

Compounding that error, and only adding to the confusion that the jury must have suffered, the District Court earlier made another critical error in the jury instructions saying that Amos had to prove a "direct causal link" between his protected disclosures and his supervisor's prohibited personnel action in order to make out a claim under the DC-WPA. Again, this is not a proper statement of the law and was given over Amos's objection. Under the DC-WPA, all that is needed for the whistleblower to make out a *prima facie* case is that his protected disclosure be "a contributing factor" in the alleged prohibited personnel action. Then, importantly, the burden shifts and the District must then prove (not by a preponderance of the evidence, but) by clear and convincing evidence, that its termination of the whistleblower would have occurred for "legitimate, independent reasons" even if he or she had not engaged in protected disclosure under the DC-WPA.

What obviously confused the District Court is that only when the rare case comes along and the District carries its heavy burden by clear and convincing evidence under the DC-WPA, then and only then does the burden shift back to the employee to show that the prohibited personnel action was joined by "a direct causal link" to the protected disclosure. It was reversible error for the District

12

Court to instruct the jury on the improper burden of proof that the jury had to apply, and it was not harmless error since it was an instruction on liability and on the burden of proof, and since all of the instructions are to be taken as a whole.

This Court on appeal should review the evidentiary record not for purposes of evaluating the correctness of the jury's verdict, but rather in order to determine that the District Court's errors of law were not harmless. Amos submits it is manifestly apparent from a review of the record that the jury was confused by the District Court's errors of law. Amos presented evidence that was either unopposed or admitted that on least seven (7) occasions he made protected disclosures under the DC-WPA. And the District, for its part, came nowhere near the level of proof that would be necessary to carry its weighty burden of proof by clear and convincing evidence that Amos's supervisor had a "legitimate, *independent* reason" for terminating Amos's employment unrelated to Amos's protected disclosures since it was Moneme who terminated Amos's employment, and Moneme cannot be said to be "independent" since he was the one upset and angry about Amos's disclosures.

Finally, the District Court abused its discretion when it required the jury (over Amos's objection) to fill out a complex verdict form containing special interrogatories and burden shifts that are difficult even for the most seasoned of trial judges and lawyers to follow. Given the complexity of the jury instructions as

13

a whole, and given the aforementioned infirmity in the instructions that the District Court indicated it was going to give, a general verdict form on the single count of retaliation was needed and a complex verdict form was an abuse of discretion. Each of the foregoing errors, standing alone, is enough to warrant a new trial. Taken together, a new trial is a necessity.

## ARGUMENT

I. **THE DISTRICT COURT'S RESPONSE TO THE JURY'S NOTE WAS INCORRECT, MISLEADING, AND NOT HARMLESS ERROR.**

### A.    **Standard of Review.**

If a case involves legal error that is found not to be harmless, this Court merely remands for a new trial pursuant to the correct legal standard.  *See*, *e.g.*, *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998) (remanding for new trial because of erroneous exclusion of evidence).  This Court of Appeals must remand for a new trial unless it is convinced that an erroneous instruction did not affect the jury's verdict.  *See Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946); *Jordan v. Medley*, 711 F.2d 211, 218-19 (D.C. Cir. 1983); *see also Beckman v. Farmer*, 579 A.2d 618, 648-49 (D.C. 1990).  Any significant doubt must be resolved in favor of a new trial.  *See Kotteakos*, 328 U.S. at 765.  As Justice Rutledge so famously wrote in *Kotteakos* describing a harmless error analysis:  "But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected."  *Id.*

"Jury instructions are proper if, when viewed as a whole, they fairly present the applicable legal principles and standards."  *Czekalski v. LaHood*, 589 F.3d 449, 453-54 (D.C. Cir. 2009) (citing *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549,

556 (D.C. Cir. 1993) (internal citations omitted)).  While a failure to submit a proper jury instruction is a question to be reviewed *de novo*, the standard of review for an allegation of improper choice of language used in a particular instruction is abuse of discretion and the harmless error rule applies.  *See id.* (Buckley, J.) ("An alleged failure to submit a proper jury instruction is a question of law subject to *de novo* review; the choice of the language to be used in a particular instruction, however, is reviewed only for abuse of discretion."); *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 168 (D.C. Cir. 2007); *cf. Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 115-16 (2d Cir. 2000) (reviewing claims of error in jury instructions *de novo*) (citing *LNC Investments*, *Inc. v. First Fidelity Bank*, *N.A.*, 173 F.3d 454, 460 (2d Cir. 1999)).  Under the harmless error rule in order for improper jury instruction language to warrant a reversal, the error must have been prejudicial and it must have affected the outcome.  *See Czekalski*, 589 F.3d at 453-54 (citing *Muldrow*, 493 F.3d at 168) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)); *see* Fed. R. Civ. P. 61.

      B.    **The District Court's Response to the Jury's Note Did Not Take Account of the Important Common Law and Statutory Exceptions to Employment At-will.**

The District Court improperly instructed the jury during its deliberations on the employment at-will doctrine and utterly failed to instruct on its relationship to the DC-WPA.  During deliberations, the jury sent out a single note and asked:

16

"Could you please provide the description for the Whistleblower Act and At will

employee."  The District Court's written response was as follows:

> Employment at will is employment that is usually
> undertaken without a contract and that may be terminated
> at any time, by either the employer or the employee,
> without cause.

> The D.C. Whistleblower Protection Act forbids a
> supervisor from retaliating or threatening to retaliate
> against an employee of the D.C. government because of
> the employee's protected disclosure.

This description does not fully encompass the at-will employment doctrine and it

was given over the Plaintiff's objection.  *See* J.A. at 1166, 1232.  The District

Court should have stated, *inter alia*, that an at-will employee can be terminated for

any reason or no reason, but not for an illegal reason.  *See generally Adams v.*

*George W. Cochran & Co.*, *Inc.*, 597 A.2d 28, 34 (D.C. 1991) ("We therefore

hold . . . that there is a[n]. . . exception to the at-will doctrine under which a

discharged at-will employee may sue his or her former employer for wrongful

discharge when the sole reason for the discharge is the employee's refusal to

violate the law, as expressed in a statute or municipal regulation.").  The exception

to the at-will doctrine articulated in *Adams* (and other cases since *Adams* was

decided) applies with greater force in this case because the DC-WPA specifically

proscribes the termination of an employee for making protected disclosures or for

refusal to comply with an illegal order.  *See* D.C. Code § 1-615.53(a).

When undersigned counsel for Amos suggested to the District Court that the definition should include language making it clear that an at-will employee cannot be terminated for an illegal reason, the District Court stated that it did not want to overemphasize any particular instruction. *See* J.A. at 1166-67. The problem with the District Court's rationale is that there was no instruction defining at-will employment prior to the jury's note, and so there was nothing in the jury instructions that was at risk of being overemphasized. *See* J.A. at 1033-50.

But getting the definition of at-will employee wrong was not the District Court's only mistake in response to this jury note. The District Court's response does not take account of the obvious way in which the jury was connecting the concept of at-will employees with the DC-WPA. The jury's question is asking about both concepts in the same note – indeed in the same question in a single sentence. *See* J.A. at 1232. It was error for the District Court not to explain how retaliation under the DC-WPA is a statutory exception to the at-will employment doctrine. *Cf.* D.C. Code § 1-615.53(a). It was further error for the District Court not to explain that under the common law there are also exceptions to the at-will doctrine which allow employees not to be wrongfully terminated for failing to follow illegal orders, or in retaliation for supporting an officially declared public policy. *See*, *e.g.*, *Adams*, 597 A.2d at 34; *Carl v. Children's Hosp.*, 704 A.2d 159, 162-64 (D.C. 1997) (en banc). And it was also error for the District Court to

18

simplify its earlier description of the DC-WPA into a single sentence without any reference at all to the other provisions of the statute or to the other instructions already given to the jury.  Plaintiff is entitled to a new trial.

### C. The Error Was Not Harmless Because It Concerned the Jury's One and Only Note to the District Court, and It Allowed the Jury to Confuse the Concept of Employment At-will, and the Exception to it That the DC-WPA Represents.

As aforementioned, the District Court responded to the jury's request for a description of employee at-will with an incomplete and misleading response, over Amos's objection, which did not fully and fairly instruct the jury on the applicable law.  The jury was instructed before retiring, to:  "treat and consider all of [the] jury instructions as a whole.  [Jurors] must give each instruction equal importance and consider each one equally with all other instructions."  J.A. at 1035 (spoken instruction), 1196 (written instruction).  District of Columbia law recognizes that employment at-will means:  "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all."  *E.g.*, *Adams*, 597 A.2d at 30; *Darrow v. Dillingham & Murphy*, *LLP*, 902 A.2d 135, 138 (D.C. 2006).  However, the District of Columbia recognizes narrow exceptions to the employment at-will doctrine such as the public policy exception, or the exception for refusal to violate a statute.  *See id.*  Public policy exceptions are decided on a case-by-case basis and must "reflect a clear mandate of public policy – *i.e.*, those that make a clear

19

showing, based on some identifiable policy that has been officially declared."
*Carl*, 702 A.2d at 164 (internal citations omitted) (en banc).

In *Czekalski*, the plaintiff alleged that the magistrate judge improperly
instructed the jury on what constitutes an adverse action under Title VII. *See* 589
F.3d at 453. The D.C. Circuit found on appeal that while the second paragraph of
the jury charge "wants for clarity" the most troubling aspect was simply a missing
comma and this Court did not believe the jury could misread the meaning of the
instruction. *See id.* at 454. Additionally, as the instruction relayed the relevant
standard for adverse employment action this Court determined the "jury had the
guidance necessary to render its special verdict as to whether [plaintiff] suffered an
adverse employment action." *Id.* at 454. Therefore this Court held that when
viewed as a whole the instructions "fairly present the applicable legal principles
and standards." *Id.* at 455 (citing *Joy*, 999 F.2d at 556) (internal citations omitted).

In the instant case, the District Court received a written note from the jury
asking: "Could you please provide the description for the Whistleblower Act and
[a]t will employee." J.A. at 1232. In response, the District Court, over Amos's
objections, wrote, in part: "Employment at will is employment that is usually
undertaken without a contract and that may be terminated at any time, by either the
employer or the employee, without cause." *Id.* The District Court's response
completely failed to address the public policy exception to D.C.'s employment at-

will doctrine. Amos objected on the grounds that the definition of employment at-will provided by the District Court failed to include some clause to the effect that: "notwithstanding the fact that an employer may terminate an individual who is at will without cause, it may do so to the extent that it does not violate another statute or in any way is illegal and/or in violation of the Whistle Blower Protection Act." J.A. at 1166.

The inaccurate and incomplete employment at-will description given by the District Court in this case is far greater than the missing comma in *Czekalski*. The failure to incorporate a response about the public policy exception to the employment at-will doctrine is a fatal error that does not "fairly present the applicable legal principles and standards." *Joy*, 999 F.2d at 556. It is clear from the jury's note (as well as from the jury's finding that Amos did not make a protected disclosure under the DC-WPA against the clear weight of the evidence) that the jury was struggling with the employment at-will concept, and this incomplete response to their note misinformed the jury about the applicable law and taints their decision. As such, the District Court's improper employment at-will response constitutes reversible error. *See*, *e.g.*, *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 626-30 (7th Cir. 2012) (Posner, J.) (reversing jury verdict in favor of employer and remanding for new trial in Title VII discrimination and retaliation case because trial judge's response to jury inquiry, instruction and verdict form

21

were all unsound, and errors were not harmless "because a properly instructed jury

might well have found in the plaintiff's favor.").

II.    **THE JURY INSTRUCTION ON AMOS PROVING A "DIRECT
       CAUSAL LINK" BETWEEN HIS PROTECTED DISCLOSURE AND
       HIS SUPERVISOR'S PROHIBITED PERSONNEL ACTION WAS
       INCORRECT AND MISLEADING.**

       A.     **Standard of Review.**

       Amos incorporates here by this reference the same standard of review as set

forth in subpart I.A. *supra.*

       B.     **The District Court Erred When Instructing the Jury on the
              Burden of Proof Under the DC-WPA.**

       The District Court's instruction to the jury requiring Amos to prove a "direct

causal link" in order to make out his claim was an incorrect statement of Amos's

burden of proof and the DC-WPA and, accordingly, the jury's verdict should be

overturned, and a new trial ordered.  The District Court instructed the jury on the

definition of "direct causal link" as follows:  "*You must find a direct causal link*

*between the protected disclosure and the [supervisor's] prohibited personnel*

*action in order for there to be liability under the [. . . ]Whistleblower Protection*

*Act.*  In other words, Mr. Amos must demonstrate [that] he would not have suffered

a prohibited personnel action but for his protected disclosure."  *See* J.A. at 1048-49

(spoken instruction), 1223 (written instruction).  This instruction does not

accurately state the applicable law.  *See* D.C. Code §§ 1-615.52-54.  Under the

DC-WPA:

> [T]he plaintiff must demonstrate a prima facie case by
> showing by a preponderance of the evidence that his
> 'protected disclosure' was a 'contributing factor' in the
> alleged 'prohibited personnel action' against an
> employee.  The burden then shifts to the defendant to
> show by clear and convincing evidence that the
> plaintiff's dismissal would have occurred for 'legitimate,
> independent reasons' even if he had not engaged in
> activities protected under the Act.  Finally, the jury must
> be able to find a direct causal link.

*Davis v. Dist. of Columbia*, 503 F. Supp. 2d 104, 128 (D.D.C. 2007) (citing

*Crawford v. Dist. of Columbia*, 891 A.2d 216, 218-19, 221 (D.C. 2006)).

Under the District Court's instruction Amos had to meet four elements in

order to succeed under the statute:  (a) protected disclosure; (b) prohibited

personnel action; (c) contributing factor; and (d) direct causal link.  However, an

employee can succeed under the DC-WPA without showing a direct causal link

when the District cannot prove by clear and convincing evidence a legitimate,

independent reason for its actions.  An employee-plaintiff only needs to show "but-

for" causation **after** the burden has shifted to the District, and **after** the District has

borne its heavy burden of proving a legitimate, independent reason by clear and

convincing evidence.  *See id.*; *see generally Reeves v. Sanderson Plumbing Prods.*,

*Inc.*, 530 U.S. 133, 143 (2000) ("[T]he intermediate evidentiary burdens shift back and forth . . . .  And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons . . . ." (internal quotations and citations omitted) (interpreting burden shifting framework under ADEA)).

During the briefing leading to the charge conference counsel for the District conceded this point:  "if Plaintiff establishes a *prima facie* case, including that the protected disclosure was a contributing factor to his termination, then the burden shifts to the District to demonstrate by clear and convincing evidence that the action would have been taken for legitimate, independent reasons.  If the District cannot meet its burden . . . then Plaintiff will have demonstrated a direct causal link between the termination and disclosure."  Def's Mem. at 2; ECF No. 86.[1]

---

[1]      Although not included in the Joint Appendix since this was a brief in the record below, the District filed a memorandum regarding the District Court's draft jury instructions and draft verdict form on Nov. 13, 2011.  *See* ECF No. 86.

"[As such,] [t]he District submits that the jury should not be charged on the 'direct causal link' standard."[2] *Id.*

If the D.C. Council intended for employee-plaintiffs to establish a "direct causal link" during their *prima facie* case, the statute would include some type of language requiring "but-for" causation at that stage. It does not. *See* D.C. Code § 1-615.54(b) ("In a civil action or administrative proceeding, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by § 1-615.53 was *a contributing factor* in the alleged prohibited personnel action against an employee, the burden of proof shall be on the defendant to prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section.") (emphasis added).

In addition, in *Crawford*, the procedural posture of that case was such that the jury had already determined that: (1) plaintiff met its *prima facie* case, and (2) the defendant proffered a legitimate, independent reason for the plaintiff's termination, and it was at this point the trial court determined that a "direct causal

---

[2]    The District went on to argue that the direct causal link standard is not triggered even after the District has proffered a legitimate, independent business reason. Under the District's interpretation, if the District meets its burden then there is no liability; if the District does not meet its burden then the employee-plaintiff succeeds under the statute. *See* Def.'s Mem. at 2, ECF No. 86. During oral argument, in an effort to compromise with the District's position, Amos offered to waive the obligation to show a "direct causal link" for the purposes of this case only; however, the District rejected this offer. *See* J.A. at 936-38.

link" was required.  *See* 891 A.2d at 218, 221.  Furthermore, requiring a plaintiff to show both the lesser "contributing factor" standard and the higher "but-for" causation standard at the same time is cumulative and unnecessary, not to mention confusing.  Here, the jury should have been instructed that Amos show a "direct causal link" only **<u>after</u>** the burden shifted to the District, and then only **<u>after</u>** the District carried its burden by clear and convincing evidence.  It was reversible error for the District Court to instruct the jury wrongly on the applicable burden of proof.

    C.     **This Error Was Not Harmless Since It Was on Liability and Concerned the Burden of Proof.**

When assessing whether an instruction constitutes prejudicial error courts must consider the instructions as a whole.  *See generally Western Air Lines v. Criswell*, 472 U.S. 400, 421 (1985) ("Jury instructions, of course, 'may not be judged in artificial isolation,' but must be judged in the 'context of the overall charge' and the circumstances of the case.") (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *cf. United States v. Lemire*, 720 F.2d 1327, 1340-41 (D.C. Cir. 1983) ("We must look at the jury instructions as a whole in assessing whether they constituted prejudicial error."); *cf. United States v. Baker*, 693 F.2d 183, 187 (D.C. Cir. 1982) ("In considering claims of error, appellate courts must examine the instructions as a whole, not as isolated passages.").  The District Court also instructed the jury to: "treat and consider all of these instructions as a whole.  You

26

must give each instruction equal importance and consider each one equally with all other instructions." *See* J.A. at 1035 (spoken instruction), 1196 (written instruction).

Judge Posner's opinion in *Cook*, 673 F.3d at 626-30, is instructive. In that case, an unsound response to a note from the jury coupled with an unsound jury instruction on the definition of "decisionmaker" (together with an unsound verdict form) all conspired together to demand a new trial. Those errors were determined to be not harmless. *See id.* at 629.

A jury instruction like the one the District Court gave on Amos proving a direct causal link between his protected disclosures and the prohibited personnel action is not harmless since it bears squarely on Amos's claim. *See LNC Investments*, 173 F.3d at 463 (Sotomayor, J.) ("[W]here jury instructions create an erroneous impression regarding the standard of liability, it is not harmless error because it goes directly to the plaintiff's claim, and a new trial is warranted.") (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 554-55 (2d Cir. 1996) (citing *Hendricks v. Coughlin*, 942 F.2d 109, 113-14 (2d Cir. 1991)). An instruction that improperly directs the jury on whether the plaintiff has satisfied his burden of proof is not harmless error. *See Gordon*, 232 F.3d at 115-16.

In summary, the District Court's jury charge on the burden of proof for liability under the DC-WPA was both wrong and misleading. And, as stated in

27

*Western Air Lines*, the chance sequential order of the jury charges is of no significance as to whether there is an error in charging the jury, as the order of the charges is irrelevant because the charges are to be read as a whole and not considered discretely as if they had no impact on each other. *See* 472 U.S. at 421. Thus, any errant charge taints any other charge that the District Court references and is to be read in tandem with the tainted charge.

III.   **A REVIEW OF THE RECORD IN THIS CASE SHOWS HOW CONFUSED THE JURY WAS BY THE DISTRICT COURT'S ERRORS OF LAW.**

      A.   **Appellate Review Is Appropriate Not to Displace Jury Decision But to Evaluate Whether Error Was Not Harmless.**

Amos suggests that to the extent this appellate Court looks at the record below, it is not for the purpose of re-evaluating the jury's decision, but rather for an evaluation of whether the District Court's errors were harmless or not.

      B.   **Amos Made Numerous Protected Disclosures.**

The great weight of the evidence in this record clearly indicates that Amos did in fact make a protected disclosure as defined by the DC-WPA; seven (7) of them to be exact.[3]  Under the DC-WPA "a supervisor shall not take or threaten to take, a prohibited personnel action . . . because of the employee's protected

---

[3]    As set forth more fully below, these protected disclosures were to: (1) Moneme on December 5th, (2) Kissal on December 5th, (3) Laden on December 5th, (4) Richardson on December 6th, (5) Nickles on December 6th, (6) OIG on December 7th, and (7) Moneme on December 12th.

disclosures . . . ."  D.C. Code § 1-615.53.  A protected disclosure under the DC-WPA "is *any* disclosure of information . . . including a disclosure made in the ordinary course of an employee's duties by an employee to a supervisor or a public body that the employee *reasonably believes* evidences . . . (D) A violation of federal, state, or local law, rule, or regulation, or a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature."  D.C. Code § 1-615.52 (emphasis added).

The record demonstrates that the memo dated December 4, 2007 and submitted to Amos by Edwin Gonzalez ("December 4th Memo") contained evidence of what Amos reasonably believed was a violation of federal, state, and local laws, rules, and regulations.  The record also clearly shows that Amos then disclosed the December 4th Memo to a number of people who are "supervisors" under the DC-WPA.

As set forth below, in determining if Amos made a protected disclosure, Amos's credibility as a witness is irrelevant.  The December 4th Memo is a protected disclosure in and of itself and it is uncontroverted that Amos disclosed the violations contained in it to Emeka Moneme, Director of DDOT at the time, a supervisor under the DC-WPA, as well as to the D.C. Office of the Inspector General ("OIG"), a public body, and to a number of other supervisors.

1.     Amos's Credibility Is Immaterial.

Despite the District Court's heavy reliance on the fact that "the trial presented a classic case of he said/she said, with the jury's evaluation of the credibility of Mr. Amos immediately tied to its verdict" this is simply not the case as the evidence in the record is uncontroverted that Amos took the December 4th Memo and disclosed the alleged violations in it to a number of supervisors within the District and DDOT administration as well as to the OIG.  While the District Court points out that Amos was successfully impeached at trial and some of Amos's testimony was contradicted, the matters on which Amos was impeached or contradicted were unrelated to his protected disclosures.  In making a determination of whether or not all inferences that can be reasonably drawn from the evidence is so one-sided that a reasonable jury could not disagree on the verdict, a court may not assess the credibility of the witnesses.  *See Hayman v. National Academy of Sciences*, 23 F.3d 535, 537 (D.C. Cir. 1994) (citing *Coburn v. Pan American World Airways*, *Inc.*, 711 F.2d 339, 342 (D.C. Cir. 1983)).

Francisco Gonzalez was employed by DDOT as an Equal Employment Opportunity Specialist before and during Amos's tenure at DDOT.  *See* J.A. at 190-91.  Gonzalez's duties included ensuring contract work performed for the District was complaint with civil rights programs and regulations.  *See id.* at 191.  During a routine meeting on December 3, 2007, Gonzalez outlined his concerns

30

about Fort Myer and Pessoa at South Capitol Street for Amos.  *See id.* at 205-06.

In addition to Fort Myer's noncompliance at South Capitol Street, Gonzalez told

Amos about similar misconduct Gonzalez had uncovered at the Foxhall Road site.

*See id.* at 206-07.  Gonzalez informed Amos that Peake Construction Company,

another DBE subcontractor, was having another company perform their work for

them.  *See id.* at 207.  Amos requested Gonzalez put all of this evidence and

analysis into writing and to provide Amos with a memo.  *See id.* at 210.  On

December 4, 2007, Gonzalez provided Amos with a memo describing in detail the

issues Amos and Gonzalez had discussed the day before.  *See id.*; *see also id*. at

1172-75 (December 4th Memo).

  The jury did not need to rely on Amos's testimony to understand the alleged

violations uncovered at the South Capitol site or the Foxhall Road site.  Amos's

testimony regarding the December 4th Memo was corroborated by Gonzalez, the

author of the memo, and by the memo itself which was admitted into evidence.

*See id*.

  Amos also provided testimony to the jury regarding his protected disclosures

that the District did not contest with its own witnesses, nor did the District contest

or impeach any of Amos's testimony regarding any of these protected disclosures.

Amos gave uncontested testimony that while at a meeting on December 5, 2007, he

disclosed to Carol Kissal, DDOT's Deputy Director of Resource Management at

the time, and to Ken Laden, DDOT's Associate Director Transportation Policy and Planning Administration at the time, all the allegations in the December 4th Memo by handing them a copy of it. *See id.* at 643-44. Additionally, Amos stated that because of the criminal nature of the allegations any investigation would be outside of DDOT's parameters and the December 4th Memo would have to be forwarded to OIG for investigation. *See id.* at 645. Both Kissal and Laden were supervisors as defined by the DC-WPA. *See id.* at 1183 (organizational chart of DDOT admitted in evidence). After the meeting on December 5, 2007, both Kissal and Laden separately approached Amos and asked Amos to keep the information internal to DDOT and not to forward it to the OIG. *See id.* at 645-46. The District offered no evidence to rebut Amos's assertion that he made a protected disclosure to both Kissal and Laden.

The jury heard testimony from a number of witnesses who corroborated Amos's testimony regarding his protected disclosures to supervisors and the OIG. Walker-Mincey went to the OIG with Amos to discuss the concerns about Fort Myer, Pessoa, and Peake. *See id.* at 418. At the meeting with the OIG, Walker-Mincey told the jury that Amos informed the OIG he had evidence of officials in the D.C. Government conspiring with Fort Myer. *See id.* at 336, 421. Walker-Mincey's testimony reaffirmed Amos's testimony about his disclosure to the OIG about the allegations regarding Fort Myer, Pessoa, and Peake. *See id.* at 656-59.

32

Additionally, Roger Burke, Chief of Staff of the OIG at the time, sent an e-mail to Peter Nickles, D.C. General Counsel and Acting Attorney General at the time, on December 13, 2007 which affirms that Amos did meet with OIG representatives in December 2007.  *See id.* at 1189.  Burke's email also informs Nickles that "Mr. Amos has raised *serious allegations* concerning certain entities and individuals."  *Id*. (emphasis added).  A fair reading of Burke's email to Nickles shows that Amos was requesting whistleblower protection from the OIG.  *See id.*

Emeka Moneme, Director of DDOT and Amos's supervisor during Amos' tenure at DDOT, testified that in December 2007 Amos informed Moneme that Gonzalez had approached Amos and that the two men discussed concerns Gonzalez had about Fort Myer, Pessoa, and Peake.  *See id.* at 447-48.  Moneme testified to the jury that he believed the allegations Amos was bringing to Moneme's attention were serious.  *See id.* at 448.  The jury did not need to believe Amos's testimony in order to believe Amos disclosed serious violations of law, rules, or regulations, with his supervisor, Moneme.

> 2.     December 4th Memo Is Protected Disclosure and So Is the Act of Passing it on to Supervisors.

The December 4th Memo is a protected disclosure under the DC-WPA as is Amos's act of passing the December 4th Memo on to a supervisor.  The DC-WPA does not make any distinction on who was the author or source of a protected disclosure and it manifestly applies to "*any* disclosure."  *See* D.C. Code

§ 1-615.52(a)(6).  As the evidence in the record demonstrates, Amos passed the December 4th Memo on to his supervisors and to a public body as defined by the DC-WPA, and therefore engaged in a protected disclosure.  Any disclosure of information, including a disclosure made during an employee's ordinary course of business made to a supervisor or a public body that the employee reasonably believes evidences a violation of federal, state, or local law, rule, or regulation or a term of a contract between the District government and one of their contractors is a protected disclosure under the DC-WPA.  *See* D.C. Code § 1-615.52(a)(6).  A whistleblower is an employee who makes or *is perceived* to have made a protected disclosure.  *Id.* at (a)(9).

Under the DC-WPA a "supervisor" is an individual employed by the District government who either:  1) has the authority, in the interest of the agency to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to evaluate their performance, or to adjust their grievances, or effectively recommend such action, if in connection with the foregoing . . . requires the use of independent judgment,  D.C. Code § 1-617.01; or 2)  who has the authority to effectively recommend or take remedial or corrective action for the violation of law, rule, or regulation or contract term, or the misuse of government resources that an employee may allege or report . . . ."  D.C. Code § 1-615.52(a)(8).  Moneme, Kissal, and Laden, to whom

Amos disclosed the allegations contained in the December 4th Memo, are all supervisors as defined by the statute. A "public body" under the DC-WPA "means . . . (A) the District of Columbia Office of the Inspector General . . . ." *Id.* at (a)(7)(A).

Amos took the protected disclosures contained in the December 4th Memo and relayed those allegations to his supervisor, Moneme, as well as to Kissal and to Laden, both supervisors as defined by the statute. *See* J.A. at 643-45. Additionally, Amos sent a copy of the December 4th Memo to OIG, a public body as defined by the statute. *See id.* at 711; s*ee* D.C. Code § 1-615.52(a)(7)(A). As discussed below, Amos disclosed the allegations in the December 4th Memo as demonstrated by his uncontested testimony as well as by the corroborating testimony of Walker-Mincey and Moneme, and the email from Burke which all were admitted into evidence. *See* J.A. at 336, 421, 643-45, 656-59, 1189.

        3.      **Supervisors Admitted Amos Disclosed the December 4th Memo and Discussed it With Moneme.**

Supervisors, including Amos's direct supervisor, Moneme, admitted that Amos informed Moneme in December 2007 of the contents of the December 4th Memo and thus it is undisputed that Amos made a protected disclosure of the December 4th Memo to a supervisor as defined by the DC-WPA. *See* J.A. at 447-48; D.C. Code § 1-617.01; D.C. Code § 1-615.52.

Moneme was the Director of DDOT and Amos's supervisor during Amos' entire tenure at DDOT.  In his position as Director of DDOT, Moneme was in charge of hiring for the DDOT Chief of Staff position which Amos held.  *See* J.A. at 439.  Moneme also had the authority to adjust Amos's salary, as he did several times including in August 2007.  *See id.* at 444-46.  Since Moneme had the discretion to hire Amos, adjust Amos's pay, and terminate Amos, Moneme is clearly a supervisor as defined by the DC-WPA.

Moneme admitted at trial that in December 2007 Amos informed Moneme that Gonzalez presented Amos with a report describing a potentially fraudulent relationship between Fort Myer, Pessoa, and Peake.  *See id.* at 447-48.  Moneme also testified that Amos believed he had an obligation to submit the December 4th Memo to the OIG, but Moneme asked Amos to delay sending the December 4th Memo to the OIG.  *See id.* at 448-49.  Despite telling Amos to delay in sending the December 4th Memo to the OIG, Moneme testified he believed that the allegations Amos brought to Moneme's attention in December 2007 were "serious."  *See id.* at 448.  Moneme admitted that Amos had acted properly in bringing the allegations in the December 4th Memo to Moneme's attention.  *See id.*  Moneme even called a meeting to investigate the "serious" allegations in the December 4th Memo which Amos brought to Moneme's attention.  *See id.* at 451.  It is therefore uncontested that Amos brought allegations of a violation of law, rule or regulation to the

36

attention of his supervisor in December 2007 when Amos disclosed and discussed the December 4th Memo with Moneme.

Neil Richardson was deputy chief of staff for the Executive Office of the Mayor under Mayor Adrian Fenty while Amos was working at DDOT. *See id.* at 547. On the recommendation of Maryland's then-Lieutenant Governor, Kathleen Kennedy Townsend (for whom Amos had worked previously), Richardson set up an interview with Amos. *See id.* at 548. Richardson was impressed with Amos and wanted Amos in Mayor Fenty's administration in any number of different positions. *See id.* at 548-49. Richardson decided that Amos would be a good chief of staff at DDOT and pushed Amos's resume to the City Administrator and to DDOT Director, Moneme. *See id.* at 549-50. Richardson's testimony to the jury demonstrated that Richardson had the authority to "in the interest of the agency to hire" Amos. Therefore, Richardson is also a supervisor under the DC-WPA.

Richardson testified that Amos disclosed concerns Amos had about evidence of questionable contracting between the District government, Fort Myer Construction, and Peake. *See id.* at 553. In response, Richardson told Amos that Richardson may not be the most appropriate member of the administration to talk to and referred Amos to the Mayor's General Counsel Peter Nickles. *See id.* at 554. In addition to speaking to Amos about Amos's concerns regarding Fort Myer, Peake, and Pessoa, Richardson spoke with Moneme about Amos's allegations. *See*

37

*id.* at 556. Richardson testified that Moneme was wondering why Amos was making these allegations. *See id.* It is clear from Richardson's testimony that Amos disclosed his concerns about a potential violation of law, rule or regulation to Richardson who is a supervisor as defined by the DC-WPA, and corroborates that Amos made disclosures to Moneme who is also supervisor as defined by the DC-WPA.

Amos also disclosed his concerns to the OIG as evidenced by the testimony of Walker-Mincey as well as by trial Exhibit W, OIG's Chief of Staff Burke's December 13, 2007 email to Nickles. At their December 7th meeting between officials from the OIG, Amos, and Walker-Mincey, Amos informed the OIG he had evidence of officials in the D.C. Government conspiring with Fort Myer. *See* J.A. at 336, 421. Walker-Mincey's testimony reaffirmed Amos's testimony about his disclosure to the OIG about the allegations regarding Fort Myer, Pessoa, and Peake. *See id.* at 656-59. Burke, Chief of Staff of the OIG at the time, sent an e-mail to Nickles, on December 13, 2007 which affirms that Amos did meet with OIG representatives in December 2007. *See id.* at 1189. Burke's email also informs Nickles that "Mr. Amos has raised *serious allegations* concerning certain entities and individuals." *Id.* (emphasis added).

Amos also disclosed his concerns about the allegations in the December 4th Memo to Nickles which was corroborated by the testimony of D.C. City

38

Administrator, Dan Tangherlini. Tangherlini testified he had a conversation with Nickles where Nickles informed Tangherlini that Amos had disclosed such information. Tangherlini testified that he had a conversation with Nickles regarding concerns Amos had about Fort Myer Construction. *See id.* at 94. Tangherlini testified that Nickles informed Tangherlini that Amos had discussed "something to do with Fort Myer and other construction companies, things happening at DDOT . . . ." *Id.* Nickles denied ever having spoken to Amos about the allegations contained in the December 4th Memo. *See* J.A. at 87 ("[M]y recollection would be that Fort Meyer is a military base over in Virginia."). Tangherlini makes it clear that Amos and Nickles did in fact have a discussion about the allegations regarding Fort Myer Construction (not the military base) and DDOT.

Amos made a seventh and final disclosure to Moneme when Amos informed Moneme that Amos had already disclosed the December 4th Memo to the OIG. When Amos informed Moneme that Amos had already disclosed the December 4th Memo to the OIG on December 12, 2007, Moneme told Amos that Amos had betrayed Moneme by sending the December 4th Memo to OIG despite Moneme's instructions not to send anything to the OIG. *See id.* at 665. Belynda Roebuck, Amos's Executive Assistant from November 2007 through January 2008, recalled for the jury an instance where Moneme went into Amos office and in an "angry"

39

tone said something to the effect of "I spoke to you about this or we talked about this, something like that." J.A. at 147-48. And while Moneme did not admit to an angry outburst he admitted he took away Amos's file regarding the December 4th Memo later in December because Moneme believed that Amos was not impartial. *See id.* at 449-51.

> 4. Amos Had an Objectively Reasonable Good Faith Belief the December 4th Memo Was a Protected Disclosure.

In addition to Amos's uncontested testimony, a number of other witnesses gave testimony to the jury that Amos's belief was a reasonable one that the allegations contained in the December 4th Memo were violations of law, rule or regulation. Danette Walker-Mincey served as Chief of the Office of Integrity and Workforce Compliance during Amos's tenure at DDOT. *See id.* at 277. According to Walker-Mincey, a prime contractor could not subcontract out work under the contract without notifying the District for a number of reasons, and, that the only way a prime contractor may subcontract out work is through a formal request. *See id.* at 289-90. Walker-Mincey also testified that she thought the relationship between Peake and Den United, at the Foxhall Road site was "improper and highly suspect [–] that it was a fraudulent relationship." *Id.* at 290-91. Walker-Mincey's testimony corroborates the validity of Amos's concerns about the allegation contained in the December 4th Memo. If Walker-Mincey, a lawyer who had been employed by DDOT for far longer than Amos, thought that

40

the information showed a contracting relationship that was "highly suspect" and "fraudulent," then, certainly, Amos's belief was equally reasonable.  *See id.*; *id.* at 347; *Liser v. Smith*, 254 F. Supp. 2d 89, 99 (D.D.C. 2003) (acknowledging reliance on opinions of others, especially those in position to know relevant information, makes it far more likely for subjective opinion to be reasonable).

 *Zirkle v. District of Columbia* sets forth the appropriate test to determine whether or not Amos's belief was reasonable:

> [C]ould a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence [illegality]?  A purely subjective perspective of an employee is not sufficient even if shared by other employees.  The WPA is not a weapon in arguments over policy or a shield for insubordinate conduct.

830 A.2d 1250, 1259-60 (D.C. 2003) (citing *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)).  "This analysis hinges not upon whether the order was ultimately determined to be illegal, but whether appellant reasonably believed that it was illegal."  830 A.2d at 1260.

 Gonzalez, the DDOT Equal Employment Opportunity Specialist before and during Amos's tenure, was responsible for ensuring that contractor work was compliant with civil rights programs and regulations.  *See* J.A. at 191-92.  As part of his duties, Gonzalez made an unannounced site visit to the "South Capitol Street" site where Fort Myer Construction Company was the prime contractor and

41

Pessoa Construction Company was a subcontractor. *See id.* at 198. During his

visit, Gonzalez discovered Pessoa was not performing work as a subcontractor;

instead, Pessoa had contracted out the work to another company, Anchor

Construction, without DDOT's knowledge. *See id.* This discovery was a violation

of Fort Myer's contract with DDOT and a violation of the Disadvantaged Business

Enterprise ("DBE") program, which the project was subject to, as the program

requires that a minimum of thirty percent of the work be done by minority

contractors. *See id.* at 199.

      During a routine meeting with Amos on December 3, 2007, Gonzalez

outlined his concerns about Fort Myer and Pessoa at the South Capitol Street site.

In addition to Fort Myer's noncompliance at the South Capitol Street site,

Gonzalez told Amos about similar misconduct Gonzalez had uncovered at the

Foxhall Road site. Gonzalez informed Amos that Peake Construction Company,

another DBE subcontractor, was having another company perform their work for

them. *See id.* at 205-07. Amos asked Gonzalez to put all of his concerns into

writing and provide Amos with a memo. On December 4, 2007, Gonzalez

provided Amos with the December 4th Memo describing in detail the issues Amos

and Gonzalez had discussed the day before. *See id.* at 1172-75.

      The December 4th Memo details a number of breaches of DDOT policies as

well as violations of federal and local laws. The memo discusses the following

violations:  1) The DBE subcontractor was not performing a commercially useful function as mandated by the DBE program; 2) The unapproved subcontractors were not paying their workers proper hourly wages in violation of federal law; 3) Fort Myer failed to request approval from DDOT of subcontractors which was a violation of its contract with DDOT; 4) Pessoa Construction was in violation of its contract with DDOT; and 5) Peake Construction violated the Davis-Bacon Act. *See id.*

The aforementioned evidence shows Fort Myer, Pessoa, and Peake's numerous improprieties, all of which qualify as protected disclosures under the DC-WPA because they are about a: "gross misuse or waste of public resources or funds, abuse of authority in connection with the administration of a public program or the execution of a public contract, a violation of a federal, state, or local law, rule or regulation, or of a term of a contract between the District government and a District government contractor . . . ."  J.A. at 1046 (spoken instructions), 1217 (written instructions); *see also* D.C. Code § 1-615.52(a)(6).

### C.     **The District Did Not Prove a Legitimate, Independent Reason to Terminate Amos.**

As noted, under the DC-WPA, the District had the duty to proffer a legitimate, independent business reason for its termination of Plaintiff.  *See* D.C. Code § 1-615.54(b).  During its case-in-chief, the District offered five witnesses: Dan Tangherlini, Frank Seales, Alfred Miller, Karen Branson, and Peter Nickles.

43

Dan Tangherlini testified that, during the pertinent time frame, he made it a

practice not to get involved in the hiring and firing practices of the City's agencies

and, as such, had nothing to do with Amos's termination. *See* J.A. at 86. Frank

Seales testified that he heard certain employees "didn't like" Amos, but Seales had

no supervisory authority over Amos. *See id.* at 860, 868-69. Alfred Miller had

very little recollection of any of the events that transpired when Amos came to visit

him at the OIG and Miller certainly had nothing to do with Amos's termination.

*See id.* at 884-88. Similarly, Karen Branson, the OIG's General Counsel, testified

that the full extent of her interaction with Amos included a discussion about

retaliation protection. *See id.* at 900-02. Peter Nickles also testified that he barely

remembered who Stephen Amos was and why Amos came to visit him. *See id.* at

91-94. During his cross-examination, Moneme testified that he terminated Amos

because Amos did not share his vision and was easily replaceable. *See id.* at 522.

Notably, however, Moneme testified that none of his concerns were ever put in

writing. *See id.* at 460. None of this evidence comes anywhere near the clear and

convincing standard required of the District under the DC-WPA. *See id.* at 1049

(spoken instructions), 1225 (written instructions); ("Clear and convincing evidence

is most easily defined as the evidentiary standard that lies somewhere between the

preponderance of the evidence and evidence probative beyond a reasonable doubt.

Such evidence would produce in the mind of the trier of fact a firm belief of

conviction as to the facts sought to be established.").  At best, the District proffered only mere summary statements from Moneme with no explanation or detail as to why Amos was terminated.

## IV.  **IT WAS AN ABUSE OF DISCRETION TO REQUIRE A COMPLEX VERDICT FORM.**

### A.  **Standard of Review.**

A trial court's verdict form is reviewed for an abuse of discretion.  *See Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 434 (1st Cir. 2010).

### B.  **Special Interrogatories Indicating a Complex Burden Shifting Analysis Were Improper and a General Liability Verdict Form Was Needed.**

The special jury verdict form required by the District Court, especially in light of the incorrect jury instructions, was improper, confusing, and misleading to the jury.  A verdict form should not be considered in isolation, but must be evaluated together with the jury instructions.  *See Caudle v. Dist. of Columbia*, 804 F. Supp. 2d 32, 54-55 (D.D.C. 2011), *rev'd and remanded*, 707 F.3d 354 (D.C. Cir. 2013) (reversed and remanded for "golden rule" violation).  "The propriety of using a special verdict should be determined according to 'the particular circumstances of [each] case.'"  *United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998) (citing *United States v. O'Looney*, 544 F.2d 385, 392 (9th Cir. 1976)).

The District Court provided the jury with an incorrect jury instruction on "direct causal link" which improperly shifted the burden to Amos to show a direct

45

causal link before the District had to demonstrate, by clear and convincing evidence, that Amos was terminated for a legitimate independent reason. *See* subpart II.B, *supra*. Additionally, the District Court incorrectly instructed the jury in the definition of employment at-will over Amos's objections. *See* subpart I.B, *supra*. While this alone is enough to warrant a new trial, the fact that the jury was made to fill out a special verdict form which posed specific interrogatories only compounded the jury's confusion. The verdict form asks the jury 6 questions and provides 4 sets of instructions to the jury based on their response to the prior questions. *See* J.A. at 1233-34. Without the proper burden shifting instruction or employment at-will definition the verdict form likely caused confusion. The verdict form, taken in conjunction with the District Court's incorrect direct causal link and employment at-will instruction mislead the jury and warrants a new trial.

Additionally, the verdict form with 6 special interrogatories, along with the direct causal link jury instruction inappropriately confused the jury's role to decide if Amos had suffered retaliation under the DC-WPA. *See*, *e.g.*, *Gordon*, 232 F.3d at 118. In employment retaliation cases, the jury is responsible for deciding the ultimate question of whether retaliation for the protected activity caused the adverse action. *See id.* Burden shifting language was developed for judges and when one introduces such discussions to the jury is it "at best irrelevant, and at

46

worst misleading to a jury." *Id.* (citing *Renz v. Grey Advertising*, *Inc.*, 135 F.3d 217, 223 (2d Circ. 1997) (internal citations omitted)).

In *Gordon*, a New York City Public School teacher brought a Title VII discrimination and retaliation claim against the School Board. The trial judge in the case instructed the jury on the burden shifting framework of the *McDonnell Douglas* test by instructing the jury, over Plaintiff's objection, as follows: "Once the Board proffered its non-retaliatory reasons for its actions against Gordon, the burden shifted back to plaintiff to prove that ... defendant's reasons are pretextual, that is, they are not the real or true reasons for the agent's actions and that retaliation is a true reason." *Gordon*, 223 F.3d at 115. The Second Circuit found that this instruction was improper by "creat[ing] a distinct risk of confusing the jury." *Id.* at 118. The Second Circuit stated that the jury acts only as a fact finder and as the "burden-shifting framework exists to assist a trial judge in [their] role 'as a determiner of whether a case meets the legal requirements for a decision by a fact-finder' . . . [the instruction] could easily have led the jury astray from it role – merely [as fact finder]." *Id.* (citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 280 (2d Cir. 1994)).

Similarly, in this case, the District Court discussed the burden shifting framework with the jury when it instructed the jury on the definition of "direct causal link" as follows: "*You must find a direct causal link between the protected*

*disclosure and the [supervisor's] prohibited personnel action in order for there to*

*be liability under the [. . . ]Whistleblower Protection Act.*  In other words, Mr.

Amos must demonstrate [that] he would not have suffered a prohibited personnel

action but for his protected disclosure."  *See* J.A. at 1048-49 (spoken instruction),

1223 (written instruction).  Under the District Court's instruction Amos had to

meet four elements in order to succeed under the statute:  (a) protected disclosure;

(b) prohibited personnel action; (c) contributing factor; and (d) direct causal link.

However, an employee can succeed under the DC-WPA without showing a direct

causal link when the District cannot prove by clear and convincing evidence a

legitimate, independent reason for its actions.

Amos objected to including any burden shifting jury instruction or any

discussion of a burden shift on the verdict form.  *See* J.A. at 948-50.  However, the

District Court dismissed Amos's objections and included the inappropriate burden

shifting discussion in the jury instructions and the verdict form.  *See* J.A. at 1048-

49 (spoken instruction), 1223 (written instruction); *see also* J.A. at 1233-34.  The

District Court's discussion of burden shifting in its instructions and verdict form,

along with the improper instruction of employment at-will are misleading and

confusing to a jury.  Just as was the case in *Gordon* in the Second Circuit, and

*Cook* in the Seventh Circuit, a new trial is the appropriate remedy.

48

## <u>CONCLUSION</u>

WHEREFORE, and for all the foregoing reasons, Amos respectfully

requests that the entry of judgment on the verdict by the District Court be reversed,

and that the case be remanded to the District Court for a new trial.

Respectfully submitted,

/s/ Adam Augustine Carter
R. Scott Oswald, DC Bar No. 458859
Adam Augustine Carter, DC Bar No. 437381
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, N.W., 9th Floor
Washington, D.C.  20006
(202) 261-2803
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
acarter@employmentlawgroup.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*10,987*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>April 18, 2013         </u>          <u>/s/ Adam Augustine Carter      </u>
                                                           *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 18th day of April, 2013, I caused this Brief of

Appellant and Joint Appendix to be filed electronically with the Clerk of the Court

using the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

> Donna M. Murasky
> Carl J. Schifferle
> OFFICE OF THE ATTORNEY GENERAL
> 441 4th Street, NW
> One Judiciary Square, Sixth Floor
> Washington, DC,  20006
>
> *Counsel for Appellee*

I further certify that on this 18th day of April, 2013, I caused the required

copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk

of the Court and a copy of the Joint Appendix to be served, via UPS Ground

Transportation, to Counsel for the Appellee at the above address.

/s/ Adam Augustine Carter
*Counsel for Appellant*

# **ADDENDUM**

# **TABLE OF CONTENTS**

**Page**

D.C. Code § 1-615.51 ................................................................Add. 1

D.C. Code § 1-615.52 ................................................................Add. 2

D.C. Code § 1-615.53 ................................................................Add. 6

D.C. Code § 1-615.54 ................................................................Add. 7

D.C. Code § 1-615.55 ................................................................Add. 9

D.C. Code § 1-615.56 ................................................................Add. 9

D.C. Code § 1-615.57 ...............................................................Add. 10

D.C. Code § 1-615.58 ...............................................................Add. 10

D.C. Code § 1-615.58a .............................................................Add. 14

D.C. Code § 1-615.59 ...............................................................Add. 15

## D.C. Whistleblower Protection Act
### D.C. Code §§ 1-615.51, et seq.

### § 1-615.51. Findings and declaration of purpose.

The Council finds and declares that the public interest is served when employees of the District government are free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal. Accordingly, the Council declares as its policy to:

(1)     Enhance the rights of District employees to challenge the actions or failures of their agencies and to express their views without fear of retaliation through appropriate channels within the agency, complete and frank responses to Council inquiries, free access to law enforcement officials, oversight agencies of both the executive and legislative branches of government, and appropriate communication with the public;

(2)     Ensure that acts of the Council enacted to protect individual citizens are properly enforced;

(3)     Provide new rights and remedies to guarantee and ensure that public offices are truly public trusts;

(4)     Hold public employees personally accountable for failure to enforce the laws and for negligence in the performance of their public duties;

(5)     Ensure that rights of employees to expose corruption, dishonesty, incompetence, or administrative failure are protected;

(6)     Guarantee the rights of employees to contact and communicate with the Council and be protected in that exercise;

(7)     Protect employees from reprisal or retaliation for the performance of their duties; and

(8)     Motivate employees to do their duties justly and efficiently.

## § 1-615.52. Definitions.

(a)     For purposes of this subchapter, the term:

(1)     "Contract" means any contract for goods or services between the District government and another entity but excludes any collective bargaining agreement.

(2)     "Contributing factor" means any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.

(3)     "Employee" means any person who is a former or current District employee, or an applicant for employment by the District government, including but not limited to employees of subordinate agencies, independent agencies, the District of Columbia Board of Education, the Board of Trustees of the University of the District of Columbia,

the District of Columbia Housing Authority, and the Metropolitan

Police Department, but excluding employees of the Council of the

District of Columbia.

(4)    "Illegal order" means a directive to violate or to assist in violating a

federal, state or local law, rule, or regulation.

(5)    (A) "Prohibited personnel action" includes but is not limited to:

recommended, threatened, or actual termination, demotion,

suspension, or reprimand; involuntary transfer, reassignment, or

detail; referral for psychiatric or psychological counseling; failure to

promote or hire or take other favorable personnel action; or retaliating

in any other manner against an employee because that employee

makes a protected disclosure or refuses to comply with an illegal

order, as those terms are defined in this section.

(B) For purposes of this paragraph, the term:

(i)    "Investigation" includes an examination of fitness for duty and

excludes any ministerial or nondiscretionary factfinding activity

necessary to perform the agency's mission.

(ii)    "Retaliating" includes conducting or causing to be conducted an

investigation of an employee or applicant for employment

because of a protected disclosure made by the employee or applicant who is a whistleblower.

(6)    "Protected disclosure" means any disclosure of information, not specifically prohibited by statute, without restriction to time, place, form, motive, context, forum, or prior disclosure made to any person by an employee or applicant, including a disclosure made in the ordinary course of an employee's duties by an employee to a supervisor or a public body that the employee reasonably believes evidences:

(A)    Gross mismanagement;

(B)    Gross misuse or waste of public resources or funds;

(C)    Abuse of authority in connection with the administration of a public program or the execution of a public contract;

(D)    A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or

(E)    A substantial and specific danger to the public health and safety.

(7)    "Public body" means:

    (A)    The United States Congress, the Council, any state legislature, the District of Columbia Office of the Inspector General, the Office of the District of Columbia Auditor, the District of Columbia Financial Responsibility and Management Assistance Authority, or any member or employee of one of these bodies;

    (B)    The federal, District of Columbia, or any state or local judiciary, any member or employee of these judicial branches, or any grand or petit jury;

    (C)    Any federal, District of Columbia, state, or local regulatory, administrative, or public agency or authority or instrumentality of one of these agencies or authorities;

    (D)    Any federal, District of Columbia, state, or local law enforcement agency, prosecutorial office, or police or peace officer;

    (E)    Any federal, District of Columbia, state, or local department of an executive branch of government; or

    (F)    Any division, board, bureau, office, committee, commission or independent agency of any of the public bodies described in subparagraphs (A) through (E) of this paragraph.

(8)     "Supervisor" means an individual employed by the District

government who meets the definition of a "supervisor" in

§ 1-617.01(d) or who has the authority to effectively recommend or

take remedial or corrective action for the violation of a law, rule,

regulation or contract term, or the misuse of government resources

that an employee may allege or report pursuant to this section,

including without limitation an agency head, department director, or

manager.

(9)     "Whistleblower" means an employee who makes or is perceived to

have made a protected disclosure as that term is defined in this

section.

## § 1-615.53. Prohibitions.

(a)     A supervisor shall not take, or threaten to take, a prohibited personnel

action or otherwise retaliate against an employee because of the

employee's protected disclosure or because of an employee's refusal to

comply with an illegal order.

(b)     Except in cases where the communication would be unlawful, a

person shall not interfere with or deny the right of employees,

individually or collectively, to furnish information to the Council, a

Council committee, or a Councilmember.

## § 1-615.54. Enforcement.

(a)(1) An employee aggrieved by a violation of § 1-615.53 may bring a civil action against the District, and, in his or her personal capacity, any District employee, supervisor, or official having personal involvement in the prohibited personnel action, before a court or a jury in the Superior Court of the District of Columbia seeking relief and damages, including:

    (A)    An injunction;

    (B)    Reinstatement to the same position held before the prohibited personnel action or to an equivalent position;

    (C)    Reinstatement of the employee's seniority rights;

    (D)    Restoration of lost benefits;

    (E)    Back pay and interest on back pay;

    (F)    Compensatory damages; and

    (G)    Reasonable costs and attorney fees.

(2)    A civil action shall be filed within 3 years after a violation occurs or within one year after the employee first becomes aware of the violation, whichever occurs first.

(3)    Section 12-309 shall not apply to any civil action brought under this section.

(a)     In a civil action or administrative proceeding, once it has been
        demonstrated by a preponderance of the evidence that an
        activity proscribed by § 1-615.53 was a contributing factor in
        the alleged prohibited personnel action against an employee, the
        burden of proof shall be on the defendant to prove by clear and
        convincing evidence that the alleged action would have
        occurred for legitimate, independent reasons even if the
        employee had not engaged in activities protected by this
        section.

(b)     Notwithstanding any other provision of law, a violation of
        § 1-615.53 constitutes a complete affirmative defense for a
        whistleblower to a prohibited personnel action in an
        administrative review, challenge, or adjudication of that action.

(c)     An employee who prevails in a civil action at the trial level,
        shall be granted the equitable relief provided in the decision
        effective upon the date of the decision, absent a stay.

(d)     (1) If a protected disclosure assists in securing the right to
        recover, the actual recovery of, or the prevention of loss of
        more than $100,000 in public funds, the Mayor may pay a
        reward in any amount between $5,000 and $50,000 to the

person who made the protected disclosure; provided, that any

reward shall be recommended by the Inspector General, the

District of Columbia Auditor, or other similar law enforcement

authority.

(2) This subsection shall not create any right or benefit,

substantive or procedural, enforceable at law or equity, by a

party against any District government agency, instrumentality,

officer, employee, or other person.

## § 1-615.55. Disciplinary actions; fine.

(a)     As part of the relief ordered in an administrative, arbitration or

judicial proceeding, any person who is found to have violated

§ 1-615.53 or § 2-223.02 shall be subject to appropriate disciplinary

action including dismissal.

(b)     As part of the relief ordered in a judicial proceeding, any person who

is found to have violated § 1-615.53 or § 2-223.02 shall be subject to a

civil fine not to exceed $10,000.

## § 1-615.56. Election of remedies.

(a)     The institution of a civil action pursuant to § 1-615.54 shall preclude

an employee from pursuing any administrative remedy for the same

cause of action from the Office of Employee Appeals or from an

Add. 9

arbitrator pursuant to a negotiated grievance and arbitration procedure or an employment contract.

(b)    An employee may bring a civil action pursuant to § 1-615.54 if the aggrieved employee has had a final determination on the same cause of action from the Office of Employee Appeals or from an arbitrator pursuant to a negotiated grievance and arbitration procedure or an employment contract.

(c)    Except as provided in subsections (a) and (b) of this section, nothing in this subchapter shall diminish the rights and remedies of an employee pursuant to any other federal or District law.

## § 1-615.57. Posting of notice.

The District shall conspicuously display notices of employee protections and obligations under this subchapter in each personnel office and in other public places, and shall use all other appropriate means to keep all employees informed, including but not limited to the inclusion of annual notices of employee protections and obligations under this subchapter with employee tax reporting documents and in a letter provided to employees upon commencement of employment.

## § 1-615.58. Employee responsibilities.

Employees shall have the following rights and responsibilities:

(1)    The right to freely express their opinions on all public issues, including those related to the duties they are assigned to perform; provided, however, that any agency may promulgate reasonable rules and regulations requiring that any such opinions be clearly disassociated from that agency's policy;

(2)    The right to disclose information unlawfully suppressed, information concerning illegal or unethical conduct which threatens or which is likely to threaten public health or safety or which involves the unlawful appropriation or use of public funds, and information which would tend to impeach the testimony of employees of the District government before committees of the Council or the responses of employees to inquiries from members of the Council concerning the implementation of programs, information which would involve expenditure of public funds, and the protection of the constitutional rights of citizens and the rights of government employees under this chapter and under any other laws, rules, or regulations for the protection of the rights of employees; provided, however, that nothing in this section shall be construed to permit the disclosure of the contents of personnel files, personal medical reports, or any other information in a manner to invade the individual privacy of an

employee or citizen of the United States except as otherwise provided in this chapter;

(3)    The right to communicate freely and openly with members of the Council and to respond fully and with candor to inquiries from committees of the Council, and from members of the Council; provided, however, that nothing in this section shall be construed to permit the invasion of the individual privacy of other employees or of citizens of the United States;

(4)    The right to assemble in public places for the free discussion of matters of interest to themselves and to the public and the right to notify, on their own time, fellow employees and the public of these meetings;

(5)    The right to humane, dignified, and reasonable conditions of employment, which allow for personal growth and self-fulfillment, and for the unhindered discharge of job responsibilities;

(6)    The right to individual privacy; provided, however, that nothing in this section shall limit in any manner an employee's access to his or her own personnel file, medical report file, or any other file or document concerning his or her status or performance within his or her agency, except as otherwise provided in subchapter XXXI;

(7)     Each employee of the District government shall make all protected disclosures concerning any violation of law, rule, or regulation, contract, misuse of government resources or other disclosure enumerated in § 1-615.52(a)(6), as soon as the employee becomes aware of the violation or misuse of resources;

(8)     Each supervisor employed by the District government shall make all protected disclosures involving any violation of law, rule, regulation or contract pursuant to § 1-615.52(a)(6)(D) as soon as the supervisor becomes aware of the violation;

(9)     The failure of a supervisor to make protected disclosures pursuant to § 1-615.52(a)(6)(D) shall be a basis for disciplinary action including dismissal;

(10)    Upon receipt of an adjudicative finding that a protected activity was a contributing factor in an alleged prohibited personnel action, the appropriate agency head shall immediately institute disciplinary action against the offending supervisor; and

(11)    Disciplinary action taken pursuant to this section shall follow the procedures of subchapter XVI-A, where applicable.

**§ 1-615.58a. Salary restriction for interfering with Council whistleblowers.**

District funds shall not be available for the payment of the salary of any officer or employee of the District who:

(1) Prohibits or prevents, or attempts or threatens to prohibit or prevent, any other officer or employee of the District from having any direct oral or written communication or contact with any member, committee, or subcommittee of the Council in connection with any matter pertaining to the employment of the other officer or employee or pertaining to the department or agency of the other officer or employee in any way, irrespective of whether the communication or contact is at the initiative of the other officer or employee or in response to the request or inquiry of the member, committee, or subcommittee, of the Council except where the communication or contact would be unlawful; or

(2) Removes; suspends from duty without pay; demotes; reduces in rank, seniority, status, pay, or performance rating; denies promotion to; relocates; reassigns; transfers; disciplines; or discriminates in regard to any employment right, entitlement, or benefit, or any term or condition of employment, of any other officer or employee of the District, or attempts or threatens to commit any of the foregoing

actions with respect to the other officer or employee, by reason of any

communication or contact of the other officer or employee with any

member, committee, or subcommittee of the Council as described in

paragraph (1) of this section.

**§ 1-615.59. Applicability.**

This subchapter shall apply to actions taken after July 13, 1998.